IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Wendi B. Nance, | ) | |
| | ) | Civil Action No. 3:13-cv-01803-CMC-JDA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| University of South Carolina, | ) | |
| | ) | |
| Defendant.[1] | ) | |
| | ) | |

This matter is before the Court on Defendant's motion for summary judgment. [Doc. 47.] Plaintiff, a black female, alleges race discrimination, retaliation, and hostile work environment claims pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII").[2]  Pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(A) and Local Civil Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

Plaintiff filed this action on July 1, 2013 [Doc. 1] and, with leave of this Court, filed an Amended Complaint on September 12, 2013 [Doc. 18].  On September 12, 2014, Defendant filed a motion for summary judgment.  [Doc. 47.]  Plaintiff filed a response in opposition on November 13, 2014 [Doc. 52], and Defendant filed a reply on December 5, 2014 [Doc. 59].  Accordingly, the motion for summary judgment is ripe for review.

---

[1]Michelle Dodenhoff and Elaine Delk were initially named as Defendants in this action; however, they were dismissed on November 14, 2013 pursuant to a stipulation of dismissal.  [Doc. 25.]

[2]Plaintiff initially brought an additional claim for violation of 42 U.S.C. §§ 1983 and 1985; however, this cause of action was dismissed on November 14, 2013 pursuant to a stipulation of dismissal.  [Doc. 25.]

## BACKGROUND

**Plaintiff's Employment Under Michelle Dodenhoff**

Plaintiff began working as a Director of Development ("DOD") for Defendant's Corporate and Foundation Relations ("CFR")[3] unit on June 20, 2005.  [Doc. 47-5 at 1.] CFR is a unit in Defendant's Division of Development and Alumni Relations ("D&AR"), which is responsible for obtaining financial support for Defendant.  D&AR includes the following units: Central Development, Advancement Services, Office of Annual Giving, Donor Relations, CFR, Office of Gift Planning, Principal Gifts, Regional Programs and Special Campaigns, and Alumni Association.  https://giving.sc.edu/about/staffdirectory. aspx (last visited June 2, 2015).  As DOD for CFR, Plaintiff was to identify corporations and foundations and to make relationships for Defendant for fund-raising purposes and to position Defendant's President to meet executives, foundations, and corporations.  [Doc. 52-1 at 16:11–21.]

Plaintiff's direct supervisor was Michelle Dodenhoff ("Dodenhoff").  [Doc. 47-8.] When Plaintiff was hired as a DOD for CFR, Dodenhoff was Assistant Vice President of University Development [*see* Doc. 47-5 at 1]; Dodenhoff was later promoted to Vice President for D&AR [Doc. 47-7].  Dodenhoff did not closely supervise Plaintiff [Doc. 47-9 at 40]; however, Dodenhoff and Plaintiff met every two weeks [Doc. 47-6 at 81:16–18]. Dodenhoff did not conduct annual evaluations for many of her direct reports, including Plaintiff.  [Doc. 47-8.]

---

[3]CFR is sometimes referred to as Foundations and Corporations in the record before this Court.

After Plaintiff worked for Defendant for about eighteen months and realized the volume of work for which she was responsible, she asked Dodenhoff for staff.[4] [Doc. 52-1 at 90:3–11.] Dodenhoff asked Plaintiff to research other institutions to determine how their CFR divisions were structured, and Plaintiff provided Dodenhoff with her findings. [*Id.* at 90:3–91:4.] Dodenhoff told Plaintiff that she would take the request under consideration. [*Id.* at 91:5–7.]

**Grenzenbach Glier and Associates' Evaluation**

Leading up to the launch of a billion dollar campaign, Defendant hired a consulting firm, Grenzenbach Glier and Associates ("GGA"), to evaluate development officers and develop strategies for the campaign. [Docs. 47-11 ¶ 7; 47-6 at 6:1–11; *see, e.g.*, Doc. 47-10.] As part of that review, DODs met individually with GGA consultant Laurie Musgrove ("Musgrove"), and Musgrove provided periodic reports to Dodenhoff and Susan Lee ("Lee"), who was Executive Director of Development for Defendant at the time.[5] [Docs. 47-11 ¶ 8; 47-10.] In these reports, Musgrove described Plaintiff as very defensive [Doc. 47-10 at 7], providing almost nothing meaningful [*id.* at 2], and putting on a dog and pony show [*id.* at 11]. In a quarterly report dated April 27, 2010, Musgrove provided the following assessment of Plaintiff:

> • [Plaintiff] has struggled with this engagement using the phone calls as reporting sessions for anticipated and

---

[4]When Plaintiff was hired, she was told that no one had given full time dedication to foundation relations before her. [Doc. 52-1 at 21:16–23.] Accordingly, Plaintiff was told to establish the office and put a plan in place for its operation. [*Id.*]

[5]Lee was subsequently promoted to Assistant Vice President for Development and then to Senior Associate Vice President for Development. [Doc. 47-11 ¶ 5.]

completed tasks rather than as an opportunity to discuss strategies for enhancing her work and results.

• [Plaintiff] generally brings back the same small group of foundation prospects, yet demonstrates very little progress with any of them. She cites many reasons why she cannot make progress, including lack of action by the Vice President and President, to lack of responsiveness by faculty to requests for information. She is not open to discussions about different approaches to her work overall or with individual prospects.

• It is clear to [GGA] that the foundation office at USC has no clear strategy and is reactive at best. Suggestions made to [Plaintiff] to improve her work through establishing guidelines for faculty and other University staff members to work with the foundation office and training of faculty were only reluctantly acknowledged as reasonable solutions and only after the Vice President reiterated the importance of [Plaintiff] implementing these recommendations.

• She does not appear to be prepared for the calls, often mentioning that her assistant sent profiles and [Plaintiff] was not sure what was sent; not having files and notes with her for calls; contradicting her recollections and actions during the discussion; and, generally not knowing the status of her work with her assigned prospects.

• There is no sense of urgency as illustrated by long lapses between actions, completed follow up, and preparations for visits and proposals.

• [Plaintiff's] tenure at USC and elsewhere suggests she should be effective in this role. Based on work with her since November, [GGA] does not believe she can fill the role required for the current campaign.[6]

---

[6]Defendant's employees shared some of Musgrove's concerns about Plaintiff. Lee received complaints from development officers, deans, and faculty that Plaintiff was not responsive to their requests or communications, did not follow up with projects, did not timely record information into the development database, was designated primary manager

[*Id.* at 19–20 (footnote added).]

**Elaine Delk's Hiring**

Effective March 12, 2012, Dodenhoff created a temporary position of Executive Director for CFR and hired Elaine Delk ("Delk") to fill the position from March 12, 2012 through March 11, 2013. [Doc. 47-18 at 1.] The hiring paperwork indicates this position was "[c]ritical for the success of the capital campaign" [*id.* at 2], and Dodenhoff has indicated that she realized CFR could be stronger but because she did not have the time to dedicate to CFR, she hired Delk to strengthen CFR and make it more productive [Doc. 47-9 at 39].

When Dodenhoff informed Plaintiff that she had hired Delk, Plaintiff was surprised and upset. [Doc. 52-1 at 23:1–25:6.] Plaintiff asked Dodenhoff to promote Plaintiff to a Senior Director of Development ("SDOD"), and Dodenhoff asked Plaintiff to provide written justification for the promotion; Plaintiff never provided anything to Dodenhoff. [Doc. 47-6 at 183:10–186:14.]

**CFR Under Elaine Delk**

Once Delk began in the position of Executive Director for CFR, she, rather than Dodenhoff, supervised and managed the employees in CFR. [*Id.* at 93:20–94:10; Doc. 48 at 123.] Delk, unlike Dodenhoff, closely supervised CFR employees and planned weekly team meetings, required access to staff calendars, required employees to provide weekly reports, required accountability for attendance and use of sick or annual leave, and

for prospects regardless of whether she actually worked with the prospect, and was frequently out of the office to attend board meetings or other personal activities. [Doc. 47-11 ¶ 12; *see also, e.g.*, Doc. 48 at 3–4, 8–9, 15, 27–28, 32, 34, 39, 42, 46–48, 50, 52–53, 56, 61–62, 66, 74, 89, 101, 105, 109.]

established short and long term goals for team members. [*See, e.g.*, Docs. 48 at 118, 125, 130, 140–41; 48-1 at 25; 48-2 at 72, 75–76, 88–91, 97, 133; 48-3 at 33.] Additionally, Delk implemented CFR procedures for working with the DODs from the colleges, schools, divisions, and campuses of Defendant (collectively, "Colleges"). [Doc. 47-19 ¶¶ 9–12.] Prior to these procedures, CFR had no guidelines for working with the Colleges' DODs and was unorganized. [*Id.* ¶ 8.]

As part of these procedures for working with the Colleges' DODs, Delk assigned each CFR staff person to serve as the primary point of contact for specific Colleges. [*Id.* ¶ 11.] Plaintiff was initially assigned as the primary point of contact for the School of Law, School of Medicine at Columbia, Arnold School of Public Health, School of Education, and Presidential Initiatives, and Plaintiff shared responsibility for the School of Medicine at Greenville with Delk.[7] [Doc. 48-1 at 8–9, 11–12.] Because of its large size, all DODs initially served as the points of contact for the College of Arts and Sciences.[8] [*Id.*]

In June 2012, Delk learned that Dodenhoff had not evaluated Plaintiff under Defendant's Employee Performance Management System ("EPMS"). [Doc. 48-1 at 104.]

---

[7]In May and June 2012, Delk revised the primary point of contact assignments. [Doc. 48-1 at 85–86.] In September 2012, Delk again revised the primary point of contact assignments. Delk reassigned the Schools of Medicine from Plaintiff to Delk at that time. [Doc. 52-6 at 2.]

[8]Although each CFR staff person was assigned as the primary point of contact for specific Colleges, they often worked as a team with the Colleges to solicit and draft proposals. For example, Delk, Angi Fuller Wildt ("Wildt"), and/or Charles Pulliam ("Pulliam") worked with the School of Law, the School of Medicine at Columbia, and the Arnold School of Public Health, even though these Colleges were assigned to Plaintiff. [*See, e.g.*, Docs. 48-1 at 49, 109; 48-3 at 37, 62.]

Thereafter, Delk conducted EPMS planning sessions for each employee in CFR. [Doc. 48-2 at 2.] During this process, Delk set the following goals for CFR employees:

| Employee | Title | Annual Fundraising Goal | Annual Personal Visit Goal |
|---|---|---|---|
| Angi Fuller Wildt | Director of Foundation Research | $750,000 | 36 |
| Ashley Collier | Administrative Assistant | $250,000 | 5 |
| Charles Pulliam | Assistant Director of Development | $500,000 | 36 |
| Plaintiff | Director of Development for Foundations | $750,000 | 36 |

[Docs. 48-2 at 141–48-3 at 27.] Delk emailed Plaintiff's EPMS planning document to Plaintiff on August 1, 2012 and September 6, 2012 [Docs. 48-2 at 78–87; 48-3 at 40–49]; however, Plaintiff refused to sign the EPMS planning document because she contended Delk and Plaintiff had agreed to lower Plaintiff's fundraising goal from $750,000 to $500,000 [Doc. 48-3 at 50].

On September 30, 2012, Delk sent an email to Plaintiff, outlining changes to the primary point of contact assignments and reiterating expectations. [Doc. 52-6 at 2.] More specifically, Delk informed Plaintiff that Plaintiff would now be the primary point of contact for the College of Arts and Sciences and the Arnold School of Public Health, that Plaintiff's duties as liaison to the School of Law would remain the same, and that Delk would be the primary point of contact for the Schools of Medicine. [*Id.*] Additionally, Delk informed Plaintiff that she would not be designated as the primary manager on a proposal to the

7

Bilinski Foundation because, to be considered a primary manager for a foundation, a CFR employee must assume the majority of the work for that foundation, which Plaintiff had not done with the Bilinksi Foundation.  [*Id.*]  Finally, Delk reiterated Plaintiff's work hours and that any modifications to that schedule must be approved by Delk in advance; stated that Plaintiff must take annual leave for any board or committee duties that are not directly related to USC; and noted that all weekly staff reports are due by 4:00 p.m. on Fridays, that summaries of Plaintiff's development duties are due not later than one week after her visits, and that all proposals or Letters of Inquiry must be reviewed by Delk at least two weeks prior to submission.  [*Id.*]

**Plaintiff's Leave**

On October 1, 2012, Plaintiff notified Delk that she had a migraine headache and would need to take leave.  [Doc. 48-3 at 75.]  The next day, Plaintiff notified Delk that she was not feeling well again and would need to take another day of sick leave.  [*Id.* at 77.]  On Wednesday, October 3, 2012, Plaintiff informed Delk that she was continuing to have migraine headaches, that a new medicine was causing nausea, and that she had a work release from her doctor until the following Wednesday, October 10, 2012.  [*Id.* at 80.]  Delk initially told Plaintiff to bring the work release in when Plaintiff returned to work [*id.*]; however, after consulting with Human Resources, Delk told Plaintiff she could scan the work release to Delk and later asked Plaintiff to have her doctor submit the medical leave form to Delk [*id.* at 81–83; Doc. 47-19 ¶¶ 39–40].  Delk also asked Plaintiff if she had any deadlines approaching or any final documents that needed to be proofed.  [Doc. 48-3 at 83.]

On October 4, 2012, Lee sent Plaintiff an email with the subject "BCBS–Urgent response needed," requesting a summary of the "asks" that were currently on the table for Blue Cross Blue Shield.  [*Id.* at 84.]  After Plaintiff responded that she did not have access to Millennium, the development database, at home and that she recalled the last several dealings with Blue Cross Blue Shield were handled through the President's office, Lee asked Delk to help because Lee was out of town.  [*Id.* at 88–90.]  On October 5, 2012, Delk sent a follow-up email to Plaintiff, requesting the medical leave form and asking for a status update on a proposal to the Abney Foundation [*id.* at 95]; Plaintiff responded with a photo of the doctor's note and also stated that she had requested the doctor's office send the medical work release letter directly to Delk[9] [*id.* at 97–99].  That same day, Delk sent an email to everyone in CFR, reminding them that their weekly summaries were due by 4:00 p.m.  [*Id.* at 96.]  On October 6, 2012, Delk sent an email to Plaintiff, informing Plaintiff that because Delk would be handling both Schools of Medicine, she would facilitate the writing and submission of the proposal to the Abney Foundation and requesting a written summary, by 9:00 a.m. on the date Plaintiff was scheduled to return to work, of Plaintiff's foundation visits in Chicago, any follow-up actions related to those visits, and how Plaintiff wished to proceed with the Duke Endowment call for proposals.  [*Id.* at 108.]  On October 8, 2012, Plaintiff's sick leave was extended until October 11, 2012.  [Doc. 47-26 at 4.]

---

[9]The doctor's note indicates that Plaintiff was on work release until October 8, 2012 and that Family Medical Leave Act ("FMLA") paperwork was being processed.  [Docs. 48-3 at 99; 47-26 at 3.]

9

**Human Resources Officials' Involvement**

On Friday, October 12, 2012, Plaintiff sent an email to Delk, requesting to take annual leave on Monday, October 15, 2012, to attend a board meeting. [Doc. 48-3 at 116.] Delk disapproved Plaintiff's request. [*Id.* at 117.] When Plaintiff replied to Delk's disapproval email, Plaintiff copied Defendant's President, Harris Pastides ("President Pastides"), and Dodenhoff on her response. [*Id.* at 118–19.] Delk replied to Plaintiff, President Pastides, and Dodenhoff and stated that she had checked with Human Resources, who informed her that employees were required to take annual leave, with permission from their supervisor, to attend board meetings. [*Id.*]

On October 15, 2012, President Pastides sent an email to Plaintiff, asking if she would be willing to meet with Chris Byrd ("Byrd"), Vice President for Human Resources, and Bobby Gist ("Gist"), Executive Assistant to the President, and Plaintiff agreed to meet with Byrd and Gist. [Doc. 47-9 at 4.] During the meeting with Byrd and Gist on October 18, 2012, Plaintiff expressed the following concerns[10]:

(1)    Dodenhoff hired Delk [Doc. 47-22 at 2:19–3:21];

(2)    Delk was "taking all the harvest of everything that [Plaintiff had] planted" by removing Plaintiff as the primary contact for certain foundations and Colleges

---

[10]Plaintiff secretly recorded some meetings and telephone conversations with Byrd, Gist, Dodenhoff, and others. [Doc. 47-6 at 70:13–20.] Some of those conversations have been transcribed, and the Court cites to those transcripts where applicable. The dates for each of these transcripts can be ascertained by cross-referencing Plaintiff's Answer to Interrogatory Number 1 in the Second Set of Interrogatories to the Plaintiff from Defendant USC, though the reference to 2013 appears to be a scrivener's error that should be 2012. [Doc. 47-32.]

and taking credit for monies received after Plaintiff recruited and cultivated the relationships [Doc. 47-22 at 4:15–5:15, 11:10–24, 14:7–16:21, 18:8–25];

(3)     Plaintiff had been asking Dodenhoff for staff for years but when Delk was hired, she immediately had five people, including Delk, on staff [*id.* at 5:15–6:25];

(4)     Plaintiff was in the middle of the hiring process for an assistant director when Delk was hired but Delk took over the process and hired someone she knew [*id.* at 7:1–15];

(5)     CFR was reorganized so that everyone reported to Delk [*id.* at 9:22–10:1];

(6)     Ashley Collier ("Collier"), the administrative assistant Delk hired, would not do work for Plaintiff [*id.* at 19:8–25];

(7)     Delk contacted Plaintiff while she was on FMLA leave [*id.* at 21:6–25];

(8)     Delk had told Plaintiff in a meeting that her fundraising goal would be $500,000 but the planning document included a $750,000 fundraising goal [*id.* at 23:22–25:25]; and

(9)     Delk retaliated against Plaintiff [*id.* at 26:10–21, 28:18–20].

As a result of these issues, Plaintiff stated that she did not want to work with Delk. [*Id.* at 29:18–21.] Gist responded that he and Byrd would meet with Dodenhoff and Delk [*id.* at 34:3–12], and Byrd advised Plaintiff to minimize her contact with Delk until Gist and Byrd

11

could investigate and come up with a resolution[11] [*id.* at 35:14–23]. Byrd and Gist also told Plaintiff to contact either of them if any issues arose. [*Id.* at 36:16–25.]

Byrd and Gist subsequently met with Delk and Dodenhoff individually [*see* Doc. 47-25 at 1:3–5, 1:24–2:2] and then again on November 5, 2012 with Plaintiff and Dodenhoff together [Doc. 47-25]. During that meeting, Plaintiff discussed various foundations relationships Delk had interfered with and/or taken credit for work Plaintiff did [Doc. 47-25 at 6:10–17:5, 52:2–5] and described Delk's treatment of Plaintiff as intimidating and retaliatory [*id.* at 21:23–26:20]. Plaintiff stated that she would forward all the emails she considered to be intimidating and/or retaliatory.[12] [*Id.* at 27:3–4.] Plaintiff also reported that Collier had received a copy of the September 30, 2012 email from Delk to Plaintiff and was showing it to others at a DOD meeting. [*Id.* at 42:25–46:25.] Byrd asked Plaintiff for suggestions on how to improve the situation, and Plaintiff stated that she would not report to Delk. [*Id.* at 50:20–51:10.]

After reviewing the emails from Plaintiff, Dodenhoff prepared a memorandum, dated November 12, 2012, reporting her findings to Byrd and Gist. [Doc. 47-9 at 39–41.] Dodenhoff noted that Plaintiff had had very little supervision over the six years before Delk supervised her, and the onset of accountability from Delk could have been a stressful situation. [*Id.* at 40.] Dodenhoff further noted that, although Delk could have chosen better ways to handle some situations, the emails from Delk were not inappropriate for a

---

[11]On or about October 23, 2012, Delk learned that Plaintiff had complained about Delk. [Doc. 47-19 ¶ 46.] Delk was instructed to stop communicating with Plaintiff, and Delk effectively stopped supervising Plaintiff on October 23, 2012. [*Id.* ¶¶ 47–48.]

[12]Plaintiff provided the emails to Dodenhoff on November 6, 2012. [*See* Doc. 47-9 at 7.]

supervisor to send to an employee. [*Id.* at 40.] Dodenhoff also stated that she had requested for Plaintiff to receive partial credit for the Bilinski Foundation gift and would handle the accusation that Collier had shown the email to other DODs. [*Id.*] Dodenhoff recommended that Plaintiff and her supervisor determine what board meetings Plaintiff would need to use annual leave to attend and which ones she would not. [*Id.*] Finally, Dodenhoff reiterated that she believed much of Plaintiff's reactions stemmed from a resistance to accountability and that if Plaintiff had expressed her concerns to Dodenhoff immediately when they surfaced, much of the situation could have been avoided. [*Id.* at 41.] Dodenhoff recommended that Plaintiff and Delk try to work things out with mediation but also attached information regarding an alternative position in Central Development if Byrd and Gist recommended a transfer.[13] [*Id.*] Dodenhoff also reviewed her findings and recommendations in a meeting with Plaintiff, Byrd, and Gist on November 15, 2012. [Doc. 47-15.] During that meeting, the four agreed to give Plaintiff time to consider the two options and to reconvene on November 27, 2012. [*Id.* at 27:12–29:15.]

On December 5, 2012, Plaintiff met again with Byrd and Gist to discuss the options presented to Plaintiff. [Doc. 47-20.] Plaintiff stated that the options on the table were not "really good viable options." [*Id.* at 15:15–16, 17:10–17.] Gist asked Plaintiff to provide another option that she thought would be feasible [*id.* at 17:21–18:1] and reiterated to Plaintiff that if she accepted the position in Central Development, her salary would be the same; she would move into a new office, on a different floor from Delk; and she would

---

[13]Dodenhoff created the alternative position for Plaintiff. [Doc. 47-20 at 30:7–10.] The position did not exist but Dodenhoff saw a need for someone in Central Development and proposed that the position be created and offered to Plaintiff. [*Id.*]

report to Lee, not Delk [*id.* at 33:24–35:1].  Additionally, Byrd and Gist told Plaintiff that they would help her work with Dodenhoff and Lee to set appropriate expectations for the position [*id.* at 55:4–9] and that the job description was a work in progress and Plaintiff could have input [*id.* at 50:7–51:11, 62:21–63:14].  Plaintiff stated that she would consider it over the weekend and get back to Byrd and Gist on Monday.  [*Id.* at 64:9–65:25.]

On December 10, 2013, Plaintiff met again with Byrd, Gist, and Dodenhoff, and Gist suggested that the change to the new position could occur on December 17, 2012.  [Doc. 47-28 at 5:15–23.]  Plaintiff informed Gist that she had leave scheduled on December 17, 2012, and she was hoping the change could occur at the beginning of the following year. [*Id.* at 5:24–6:5.]  On December 17, 2012, Plaintiff, through her attorney, accepted under protest the DOD position in Central Development.  [Doc. 47-9 at 42.]

**Plaintiff's New Position and Subsequent Resignation**

Plaintiff began in her position as DOD in Central Development in January 2013. [Doc. 48-4 at 22.]  On March 12, 2013, Plaintiff turned in her resignation to Lee.  [*Id.* at 64–65.]  Plaintiff's last day of employment with Defendant was March 29, 2013.[14]  [*Id.*]

---

[14]The parties devote some of the factual background sections of their briefs to discussion of the requirements of Plaintiff's new position, her concern that she was being set up for failure, her performance in the new position, her search for a new job, and her new job at Morehouse School of Medicine.  [Docs. 47-1 at 20–23; 52 at 10–11.]  However, because the Court finds, as discussed below, that Plaintiff's constructive discharge claim is barred based on Plaintiff's failure to exhaust administrative remedies with respect to this claim and because the Amended Complaint is devoid of any reference to Plaintiff's new position with Defendant or new job with Morehouse School of Medicine, the Court declines to include any facts related to Plaintiff's new position in Central Development, her search for a new job, or her new job with Morehouse School of Medicine in this background section.

**Plaintiff's EEOC Charge**

On December 10, 2012, Plaintiff signed an Equal Employment Opportunity Commission ("EEOC") intake questionnaire ("Intake Questionnaire"). [Doc. 52-11.] The Intake Questionnaire alleged that Plaintiff had been discriminated against based on her race. [*Id.* at 4.] On December 20, 2012, Plaintiff signed a charge of discrimination ("Charge"). [Doc. 52-12.]

## APPLICABLE LAW

**Summary Judgment Standard**

Rule 56 states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the

15

allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985), *overruled on other grounds*, 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

16

## <u>DISCUSSION</u>

**Exhaustion of Administrative Remedies**

Defendant first argues Plaintiff failed to exhaust her administrative remedies.  [Doc. 47-1 at 24–28.]  More specifically, Defendant argues Plaintiff failed to include her hostile work environment, retaliation, and constructive discharge claims in her Charge and that many of the allegations in Plaintiff's race discrimination claim are time-barred.  [*Id.*]

Before filing suit under Title VII, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC.  *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000) (citing *King v. Seaboard Coast Line R.R. Co.*, 538 F.2d 581, 583 (4th Cir. 1976)).  In South Carolina, the charge must be filed within 300 days after an "alleged unlawful employment practice" occurred. 42 U.S.C. § 2000e–5(e)(1); *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (citing *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1998)).  The failure to file a timely charge with the EEOC bars the claim in federal court. *McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 131 (4th Cir. 1994) ("When the plaintiff fails to file such a complaint in a timely fashion with the EEOC, the claim is time-barred in federal court.").

The allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint.  *King*, 538 F.2d at 583 (stating that a subsequent civil suit "may encompass only the 'discrimination stated in the charge itself or developed in the course of a reasonable investigation of that charge'") (quoting *EEOC v. General Electric Co.*, 532 F.2d 359, 365 (4th Cir. 1976)).  Only those claims stated in the initial administrative charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a

17

subsequent lawsuit.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir.

1996) (affirming the district court's dismissal of some of the plaintiff's claims because they

were outside the scope of her original EEOC charge and were therefore time barred).

Because the EEOC has the authority to investigate charges and take necessary action to

reach a resolution of the claims, permitting a federal complaint to include allegations

outside the scope of the predicate EEOC charge would circumscribe the EEOC's purpose

as well as deprive the employer of notice of the plaintiff's charges.[15]   *See Dorsey v.*

*Pinnacle Automation Co.*, 278 F.3d 830, 838 (8th Cir. 2002) ("Allowing a complaint to

encompass allegations outside the ambit of the predicate EEOC charge would circumscribe

the EEOC's investigatory and conciliatory role, as well as deprive the charged party of

notice of the charge, as surely as would an initial failure to file a timely EEOC charge."

(internal quotations and citation omitted)).  When a claim "raised under Title VII exceed[s]

the scope of the EEOC charge and any charges that would naturally have arisen from an

---

[15]Striking a balance "between providing notice to employers and the EEOC on the one hand and ensuring plaintiffs are not tripped up over technicalities on the other," the Fourth Circuit Court of Appeals has found exhaustion "where both the administrative complaint and formal litigation concerned 'discriminat[ion] in promotions' but involved different aspects of the 'promotional system,' and where both the EEOC charge and the complaint included claims of retaliation by the same actor, but involved different retaliatory conduct.  *Sydnor v. Fairfax County, Va*., 681 F.3d 591, 594 (4th Cir. 2012) (internal citations omitted) (alteration in *Sydnor*).  However, when the claim raised in formal litigation involves a different form of unlawful employment practice than the one described in the administrative charge, the Fourth Circuit has found the claim not to be administratively exhausted.  *See, e.g.*, *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300–01 (4th Cir. 2009) (finding that claims of age, sex, and race discrimination were not exhausted where a charge alleged only retaliation); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132–33 (4th Cir. 2002) (finding that claims of retaliation and sex and color discrimination were not exhausted where a charge alleged only race discrimination).

investigation thereof, [it is] procedurally barred." *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995).

### Hostile Work Environment Claim

Defendant argues Plaintiff failed to exhaust her hostile work environment claim because she did not specifically raise any allegations of a hostile work environment in her Charge. [Doc. 47-1 at 25–26.] However, Plaintiff's Charge includes statements related to multiple instances of allegedly discriminatory treatment over a ten-month period. [Doc. 52-12 at 2 (stating that discrimination took place from 2-12-2012 through 12-12-2012 and listing different allegedly discriminatory treatment).] As such, the Court cannot find that Plaintiff's allegations related to a hostile work environment would not have come up during the investigation of her Charge; accordingly, this claim does not exceed the scope of the Charge and summary judgment should be denied on this basis.

### Retaliation Claim

Defendant argues Plaintiff failed to exhaust her retaliation claim because all of the alleged retaliatory acts occurred before Plaintiff filed her Charge but Plaintiff did not check the retaliation box on the Charge and did not include any allegations of retaliation in her Charge. [Doc. 47-1 at 26–27.] Plaintiff contends she may bring her retaliation claim for the first time in this Court because of the exception allowing a plaintiff to raise a retaliation claim for the first time in federal court. [Doc. 52 at 15.] The Court agrees with Defendant that Plaintiff's retaliation claim is barred because she failed to exhaust administrative remedies with respect to that claim.

Although the Fourth Circuit Court of Appeals has held that a plaintiff asserting a Title VII claim of retaliation for filing a previous administrative charge is not required to

19

separately exhaust administrative remedies with regard to that retaliation claim, *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992), the exception does not apply when the alleged retaliatory acts occurred *before* the plaintiff filed a charge of discrimination, *Wilson v. Dimario*, 139 F.3d 897, at *2 (4th Cir. 1998) (unpublished table decision) (holding that the exception in *Nealon* does not apply to an allegation of retaliation that occurred before the filing of an administrative charge and, therefore, could have been included in the charge); *see also Cornelius v. McHugh*, C/A No. 3:13-1018-CMC-PJG, 2014 WL 4536349, at *1 (D.S.C. Sept. 10, 2014) (granting a motion to dismiss for lack of exhaustion with respect to a claim that could have been raised in a charge of discrimination).  Here, it is difficult to determine from the Amended Complaint what specific employment actions Plaintiff alleges were retaliatory in nature.[16]  However, the broad references to retaliation in the Amended Complaint are to actions that occurred *before* Plaintiff signed her Intake Questionnaire and Charge with the EEOC.  As such, these allegations of retaliation could have been included in the Charge.  Thus, Plaintiff failed to exhaust her administrative remedies with respect to her retaliation claim, and Defendant's motion for summary judgment should be granted as to that claim.[17]

_____

[16]The Amended Complaint alleges that Delk "treated Plaintiff in a demeaning and retaliatory manner" and that "the actions taken against the Plaintiff and the actions which ha[ve] resulted in her disparate treatment and damages all are the result of the planned and concerted effort to retaliate against the Plaintiff for the charges which she has filed against the Defendants in the past for discrimination."  [Doc. 18 ¶¶ 22(d), 30.]

[17]In her response in opposition to the motion for summary judgment, Plaintiff argues that her being given the options to continue to work with Delk or to accept the position as a DOD in Central Development was an ultimatum in retaliation for Plaintiff reporting her complaints to Defendant.  [Doc. 52 at 15.]  However, the Amended Complaint is devoid of any reference to these options.  Further, even if the choice were alleged as retaliatory in the Amended Complaint, Plaintiff was presented with these options before she signed her

### *Constructive Discharge Claim*

Defendant argues Plaintiff failed to exhaust her constructive discharge claim[18] because it was not raised in her Charge. [Doc. 47-1 at 27–28.] Plaintiff contends that a constructive discharge claim is reasonably related to and can be expected to follow from a reasonable investigation of Plaintiff's Charge because Plaintiff's Intake Questionnaire addresses the facts underlying the constructive discharge—(1) the discrimination, (2) Defendant's acknowledgment of Plaintiff's complaint, (3) Defendant's ultimatum, and (4) the demotion. [Doc. 52 at 15–17.] The Court agrees with Defendant that Plaintiff's constructive discharge claim is barred because she failed to exhaust administrative remedies with respect to that claim.

The Fourth Circuit Court of Appeals has recognized that although exhaustion of administrative remedies may be satisfied where the claim is within the scope of the reasonable investigation of an administrative charge, "the Supreme Court has made clear

_____

Intake Questionnaire or Charge. In Dodenhoff's November 12, 2012 memorandum, she recommended that Plaintiff and Delk try to work things out with mediation but also attached information regarding an alternative position. [Doc. 47-9 at 41.] The options were presented to Plaintiff in the November 15, 2012 meeting, and during that meeting, Dodenhoff, Byrd, Gist, and Plaintiff agreed to give Plaintiff time to consider the two options. [Doc. 47-15 at 27:12–29:15.] Plaintiff signed her Intake Questionnaire with the EEOC on December 10, 2012 [Doc. 52-11], and Plaintiff signed her Charge on December 20, 2012 [Doc. 52-12]. Although the attachment to Plaintiff's Intake Questionnaire refers to these options being presented to Plaintiff [Doc. 52-11 at 10], nothing in the Intake Questionnaire or Charge indicates that Plaintiff contended being presented with these options was retaliation for her raising concerns with Defendant. Indeed, the retaliation box is not checked on either the Intake Questionnaire or the Charge. Because Plaintiff could have raised a retaliation claim associated with being given these options in her Charge, such claim is now barred for failure to exhaust administrative remedies.

[18]Plaintiff alleges constructive discharge under both her race discrimination and hostile work environment claims. [Doc. 18 ¶¶ 27, 34.]

21

that a claim for constructive discharge is not necessarily saved by the 'continuing violations' doctrine." *Spencer v. Ashcroft*, 147 F. App'x 373, 75 (4th Cir. 2005) (citing *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 14 (2002) (holding that termination and failure to promote acts are discrete acts requiring exhaustion); *Young v. Nat'l Ctr. for Health Serv. Research*, 828 F.2d 235, 37–38 (4th Cir. 1987) (holding that constructive discharge is a discrete discriminatory act requiring administrative exhaustion)).  Similarly, the Seventh Circuit Court of Appeals has held that EEOC charges alleging race discrimination, retaliation, and harassment but not constructive discharge were an insufficient predicate for bringing a constructive discharge claim in federal court.  *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 n.2 (7th Cir. 2004).  In *Herron*, the court of appeals affirmed the district court's finding that a four-month delay between the filing of an EEOC charge and the employee's decision to leave was inconsistent with notice of constructive discharge. *Id.*  Here, Plaintiff's Charge does not allege that discrimination prompted her to leave her job in March 2013.  Indeed, it would have been impossible for her Charge to have mentioned her departure from Defendant or to have alleged a constructive discharge because her Charge preceded her resignation.  Like the finding in *Herron*, the four-month delay between the filing of Plaintiff's Charge in December 2012 and her resignation in March 2013 is inconsistent with notice of a constructive discharge claim to Defendant or the EEOC.  In the Amended Complaint, Plaintiff alleges constructive discharge based on being denied promotions, raises, and other financial benefits and having worse working conditions and heavier and more difficult schedules than white employees [Doc. 18 ¶ 27] and contends that she resigned "because of the daily harassment and mistreatment she received" from Dodenhoff and Delk [*id.* ¶ 34].  Here, the Court cannot find that Plaintiff's

Charge served as notice of a constructive discharge claim where Plaintiff had been removed from the working conditions and alleged harassment she received from Dodenhoff and Delk and instead reported directly to Lee for the majority of the time between the filing of the Charge and Plaintiff's resignation.[19]    As such, Plaintiff failed to exhaust her administrative remedies with respect to her constructive discharge claim, and Defendant's motion for summary judgment should be granted as to that claim.

### Race Discrimination Claims

Defendant alleges that many of the allegations in Plaintiff's race discrimination claim are time barred.  [Doc. 47-1 at 28.]  Plaintiff concedes that any facts falling before the 300-day time period are procedurally barred but contends they may constitute relevant background evidence for Plaintiff's timely claims.  [Doc. 52 at 17–18.]  Plaintiff filed her Charge on December 20, 2012, and Plaintiff's claims that occurred more than 300 days before December 20, 2012 are beyond the limitations period of Title VII.[20]  Therefore, all

---

[19]In her response in opposition to the motion for summary judgment, Plaintiff argues that her being given the options to continue to work with Delk or to accept the position as a DOD in Central Development resulted in Plaintiff taking a demotion, which ultimately caused Plaintiff's resignation. [Doc. 52 at 15–17.] She further asserts that such allegations were raised in the Charge and, therefore, her constructive discharge claim is reasonably related to her Charge. [*Id.*] However, as stated, in this action, Plaintiff's constructive discharge claim is based on her treatment and alleged harassment by Dodenhoff and Delk and not on her alleged demotion.

[20]Plaintiff asserts there are three possible dates the parties could contend the administrative remedy process was initiated—(1) December 10, 2012, when Plaintiff submitted her Intake Questionnaire; (2) December 12, 2012, the original filing date referenced on the Charge; or (3) December 20, 2012, the date Plaintiff signed the Charge. [Doc. 52 at 18.] Neither party briefed the Court on which date the Court should use as the EEOC charge filing date when determining whether Plaintiff's claims are time barred. However, the Court need not decide which date is the appropriate date to use because no alleged adverse actions occurred between the earliest potential date of February 14, 2012, 300 days before the date Plaintiff submitted her Intake Questionnaire, and the latest

claims relating to employment actions that occurred before February 24, 2012 are time-barred.

Plaintiff's Amended Complaint alleges the following adverse employment actions: Plaintiff was denied promotions; denied raises and other financial benefits; and subjected to worse working conditions, with heavier and more difficult schedules, than white employees. [Doc. 18 ¶ 27.] These can be broken down further, as Plaintiff suggests in her response in opposition to the motion for summary judgment, as the following five adverse employment actions: Plaintiff was (1) denied support staff; (2) denied a promotion to the Executive Director of CFR position in March 2012; (3) denied a promotion to a Senior DOD position in March 2012; (4) denied raises because she did not receive performance evaluations; and (5) subjected to worse working conditions because she had a heavier workload than others and a more difficult schedule.[21]

Plaintiff's claim that she was denied support staff is untimely. Plaintiff asked Dodenhoff for additional staff after she had worked for Defendant for about eighteen

_____

potential date of February 24, 2012, 300 days before the date Plaintiff signed the Charge. The Court will use the December 20, 2012 date because both parties based their 300-day calculation on this date. [Docs. 47-1 at 28; 52 at 18.]

[21]Plaintiff attempts to assert a sixth adverse employment action—"suffered a demotion into a dead end position with no opportunity of advancement"—in her response in opposition to the motion for summary judgment. [Doc. 52 at 22.] However, as previously stated, the Amended Complaint is devoid of any reference to Plaintiff being presented with the options of continuing to work with Delk or to change positions or to Plaintiff's opinion of her new position as a demotion. Because new matters cannot be raised in a response in opposition to a motion for summary judgment, *Temple v. Oconee County*, C/A No. 6:13-144-JFA-KFM, 2014 WL 4417702, at *13 (D.S.C. Sept. 8, 2014) (citing *White v. Roche Biomedical Labs,* 807 F.Supp. 1212, 1216 (D.S.C. 1992)), the Court will not address Plaintiff's purported adverse employment action related to her new position, as it was not pled in the Amended Complaint. The Court considers Plaintiff's claim that she was denied support staff to be part of her general complaint regarding worse working conditions.

months, "probably maybe in 2006." [Doc. 52-1 at 90:3–11.] Around 2009, Dodenhoff moved Mai Li Adams ("Adams") to CFR. [*Id.* at 28:1–5.] Adams subsequently resigned; after Adams left, Plaintiff hired Caryn Little ("Little") as the Assistant DOD. [*Id.* at 29:1–4.] Little left the position after about a year. [*Id.* at 93:12–16.] At some point, Dodenhoff moved Wildt to CFR. [*Id.* at 28:5–21.] By February 2012, the operative date for the limitations period in this case, Plaintiff had four people that worked under her. [*Id.* at 19:2–6.] Accordingly, Plaintiff's claim that she was denied staff is untimely because this event occurred before February 24, 2012.

Plaintiff's failure to promote claims are timely because the promotion decisions occurred in March 2012. Although not raised by either party, the Lilly Ledbetter Fair Pay Act of 2009 ("the Ledbetter Act") appears to apply to Plaintiff's claim regarding not receiving raises.[22] Because the Ledbetter Act appears to apply to this claim and because the Court

---

[22]The Ledbetter Act was passed following the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2007), which held that Title VII's 180–day statute of limitations begins to run when a discriminatory pay decision is made, not each time compensation is paid, *id.* at 632. Lilly Ledbetter filed suit within 180 days of receiving a paycheck reflecting an allegedly discriminatory wage, but the employment decisions that caused the claimed disparity in pay, discriminatory performance reviews, occurred much earlier. The Court held that the limitations period began to run at the time the discriminatory employment decisions were made, not each time a paycheck was issued. *Id.* at 627–28.

In response to this decision, Congress passed the Ledbetter Act, which provides:

> For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other

concludes, as discussed below, that summary judgment should be granted on the merits, the Court declines to find untimely Plaintiff's claim that she was denied raises because she did not receive performance evaluations.  Finally, Plaintiff's claims regarding her working conditions include allegations both before and after February 24, 2012.  With respect to Plaintiff's race discrimination claim, any factual allegations occurring before February 24, 2012 are untimely, and the Court will consider only those allegations occurring after February 24, 2012.

**Claims on the Merits**

### Race Discrimination Claim

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In 1991, Congress amended Title VII to include that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  *Id.* § 2000e-2(m).

As the Fourth Circuit Court of Appeals has explained in the wake of *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), a Title VII plaintiff may "avert summary judgment . . .

_____

practice.

42 U.S.C. § 2000e–5(e)(3)(A).  The statute thus reverses the decision in *Ledbetter* and clarifies that an unlawful employment practice occurs for purposes of the statute of limitations "each time . . . compensation is paid, resulting in whole or in part from [an unlawful employment] decision or other practice."  The Ledbetter Act, therefore, concerns the question of timing—when discriminatory practices may be challenged—by extending the statute of limitations every time a paycheck is issued.

through two avenues of proof." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). First, a plaintiff may survive a motion for summary judgment "by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor . . . motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). The Fourth Circuit defines "direct evidence" as evidence that the employer "announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor . . . ." *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982) (citing *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1113 (4th Cir. 1981)). In other words, direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995), *abrogated on other grounds by Desert Palace*, 539 U.S. 90. Circumstantial evidence may "includ[e] but [is] not limited to proof of the claimant's general qualifications, from which the inference of . . . discrimination may rationally be drawn independently of any presumption [of discrimination]." *Cline*, 689 F.2d at 485 (footnote omitted). To demonstrate an unlawful employment practice in these so-called mixed-motive cases, a plaintiff "need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence," that the impermissible factor was a motivating factor, i.e., "direct evidence of discrimination is not required in mixed-motive cases." *Desert Palace*, 539 U.S. at 101–02.

Alternatively, a plaintiff may proceed under the *McDonnell Douglas* "pretext" framework. *Id.* (quoting *Hill*, 354 F.3d at 285). Under this framework, an employee must

first prove a prima facie case of discrimination.[23] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff succeeds, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* By providing such an explanation, the employer rebuts the presumption of discrimination created by the prima facie case, and "[t]he presumption, having fulfilled its role of forcing the [employer] to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). If the employer articulates a legitimate, nondiscriminatory reason, the burden shifts back to the employee to show that the articulated reason was actually a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804.

However, the Fourth Circuit Court of Appeals has emphasized that, "[r]egardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional

---

[23] To establish a prima facie case of discrimination, a plaintiff must demonstrate (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action; and (4) other employees who are not members of the protected class did not suffer the adverse employment action under similar circumstances. *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002); *see also EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 851 n.2 (4th Cir. 2001) ("What is critical with respect to the fourth element is that the plaintiff demonstrate he was not hired (or fired or not promoted, etc.) 'under circumstances which give rise to an inference of unlawful discrimination.'" (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981))).

discrimination.'" *Hill*, 354 F.3d at 286 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 153 (2000)).  Further, the court stated,

> To demonstrate such an intent to discriminate on the part of
> the employer, an individual alleging disparate treatment based
> upon a protected trait must produce sufficient evidence upon
> which one could find that "the protected trait . . . actually
> motivated the employer's decision."  *Reeves*, 530 U.S. at 141,
> 120 S.Ct. 2097 (internal quotation marks omitted).  The
> protected trait "must have actually played a role in the
> employer's decisionmaking process and had a determinative
> influence on the outcome."  *Id.* (internal quotation marks and
> alterations omitted); *cf. Price Waterhouse* [*v. Hopkins*], 490
> U.S. [228,] 277, 109 S. Ct. 1775 (O'Connor, J., concurring)
> (noting that "statements by nondecisionmakers, or statements
> by decisionmakers unrelated to the decisional process itself [do
> not] suffice to satisfy the plaintiff's burden" of proving
> discrimination); *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 678
> (7th Cir. 2002) (noting that the pertinent inquiry is whether the
> decision maker, as opposed to other managers or
> subordinates, evaluated the aggrieved employee based upon
> discriminatory criteria).

*Id.*  Thus, whether a plaintiff proceeds under the first or second avenue of proof, the

plaintiff's ultimate burden is to demonstrate the employer's adverse employment action was

motivated, at least in part, by discrimination.

In this case, the Court must determine whether Plaintiff has demonstrated a genuine

issue of material fact remains as to whether her denial of a promotion to the Executive

Director of CFR position, denial of a promotion to a Senior DOD position, denial of raises

because she did not receive performance evaluations, and worse working conditions were

motivated, at least in part, by race discrimination.[24]

---

[24]The briefing by the parties primarily addresses the *McDonnell Douglas* framework;
however, Plaintiff argues that she has direct evidence of discrimination because she was
one of the only, if not the only, black employee in CFR and because of racially derogatory
remarks by Delk.  [Doc. 52 at 20–21.]  However, the Court cannot infer from the absence

of black employees that race was a motivating factor in Plaintiff's denial of a promotion to the Executive Director of CFR position, denial of a promotion to a Senior DOD position, denial of raises because she did not receive performance evaluations, and worse working conditions. Plaintiff has presented bare statistics without any explanation of the relevance of these numbers or any information about the applicant pools for CFR positions. As the Fourth Circuit Court of Appeals has stated,

> The usefulness of statistics depends on the surrounding facts and circumstances. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1857, 52 L.Ed.2d 396 (1977). In a case of discrimination in hiring or promoting, the relevant comparison is between the percentage of minority employees and the percentage of potential minority applicants in the qualified labor pool. *See Hazelwood*, 433 U.S. at 308, 97 S.Ct. at 2742 (comparing proportion of African-American teachers employed by school district to proportion of qualified African-American teachers in surrounding area); *Teamsters*, 431 U.S. at 337 & n. 17, 97 S.Ct. at 1855 & n. 17 (comparing racial composition of nearby metropolitan area with racial composition of manual workforce).
>
> The mere absence of minority employees in upper-level positions does not suffice to prove a prima facie case of discrimination without a comparison to the relevant labor pool. *See Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 484 (9th Cir. 1983); *see also Hagans v. Andrus*, 651 F.2d 622, 627 (9th Cir.) (regarding low percentage of women in high-level positions as "meaningless" without evidence of pool of qualified women applicants), *cert. denied*, 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981). Moreover, if a plaintiff offers a statistical comparison without expert testimony as to methodology or relevance to plaintiff's claim, a judge may be justified in excluding the evidence. *Williams*, 871 F.2d at 455 n. 1.

*Carter v. Ball*, 33 F.3d 450, 456–57 (4th Cir. 1994). Additionally, although a fact issue exists regarding whether Delk made a racially derogatory remark [*see* Docs. 47-6 at 193:8–13 (Plaintiff's deposition testimony that she had a conversation with Delk about her previous job with Richland District Two, and Delk told Plaintiff "how great the district used to be, and she said that there were a number of - - it all changed, and there were a number of blacks and poor people who came and it's never been the same"); 47-19 ¶¶ 49–50 (Delk's averment that she never made this statement to Plaintiff)], stray commends alone do not constitute evidence of discrimination, *see Brinkley v. Harbour Recreation Club*, 180

*Failure to Promote Claims*

Failure to Promote to Executive Director

With respect to Plaintiff's claim of failure to promote to Executive Director, even

assuming without deciding Plaintiff can establish a prima facie case of race discrimination,[25]

_____

F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination.") (internal quotations marks and alterations omitted), *overruled on other grounds by Desert Palace*, 539 U.S. 90.  Accordingly, Plaintiff has failed to provide sufficient direct evidence to raise a genuine issue of material fact as to whether her denial of a promotion to the Executive Director of CFR position, denial of a promotion to a Senior DOD position, denial of raises because she did not receive performance evaluations, and worse working conditions were motivated, at least in part, by race discrimination, and the Court will evaluate Plaintiff's claims under the *McDonnell Douglas* framework.

[25]As one court within the Fourth Circuit has noted, "[t]he relevance of the *McDonnell Douglas* scheme outside of the trial context is limited."  *Lerner v. Shinseki*, No. ELH-10-1109, 2011 WL 2414967, at *14 (D. Md. June 10, 2011).  The Fourth Circuit has observed,

> Notwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of "the ultimate question of discrimination vel non."  *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983). As the Supreme Court has explained, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).  Thus, "[c]ourts must . . . resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of 'the ultimate question of discrimination vel non.'"  *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (citation omitted).

*Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294–95 (4th Cir. 2010). Further, the Supreme Court has stated,

> Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer

31

the Court agrees Defendant has articulated a legitimate, nondiscriminatory reason for not promoting Plaintiff, and Plaintiff has failed to establish a genuine issue of material fact remains as to whether the articulated reason is pretext for unlawful discrimination. Here, Defendant argues Dodenhoff believed CFR should be stronger and hired Delk because Delk was qualified and experienced. [Doc. 47-1 at 32.] Musgrove, an outside consultant, provided the following assessment of Plaintiff in an April 27, 2010 report:

- [Plaintiff] has struggled with this engagement using the phone calls as reporting sessions for anticipated and completed tasks rather than as an opportunity to discuss strategies for enhancing her work and results.

- [Plaintiff] generally brings back the same small group of foundation prospects, yet demonstrates very little progress with any of them. She cites many reasons why she cannot make progress, including lack of action by the Vice President and President, to lack of responsiveness by faculty to requests for information. She is not open to discussions about different approaches to her work overall or with individual prospects.

- It is clear to [GGA] that the foundation office at USC has no clear strategy and is reactive at best. Suggestions made to [Plaintiff] to improve her work through establishing guidelines for faculty and other University

---

relevant. The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff."

*Aikens*, 460 U.S. at 715 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, (1981)); *see Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) ( "The Aikens principle applies, moreover, to summary judgment as well as trial proceedings."). In light of this guidance from the Supreme Court and the Fourth Circuit Court of Appeals, the Court agrees with the District of Maryland that where the employer has met its burden of articulating a legitimate, nondiscriminatory reason for its adverse action against the plaintiff, the Court may assume, without deciding, that the plaintiff has established a prima facie case of discrimination. *See Lerner*, 2011 WL 2414967, at *14.

staff members to work with the foundation office and training of faculty were only reluctantly acknowledged as reasonable solutions and only after the Vice President reiterated the importance of [Plaintiff] implementing these recommendations.

• She does not appear to be prepared for the calls, often mentioning that her assistant sent profiles and [Plaintiff] was not sure what was sent; not having files and notes with her for calls; contradicting her recollections and actions during the discussion; and, generally not knowing the status of her work with her assigned prospects.

• There is no sense of urgency as illustrated by long lapses between actions, completed follow up, and preparations for visits and proposals.

• [Plaintiff's] tenure at USC and elsewhere suggests she should be effective in this role. Based on work with her since November, [GGA] does not believe she can fill the role required for the current campaign.

[Doc. 47-10 at 19–20.] Defendant's employees shared some of Musgrove's concerns about Plaintiff. [*See* Doc. 47-11 ¶ 12; *see also, e.g.*, Doc. 48 at 3–4, 8–9, 15, 27–28, 32, 34, 39, 42, 46–48, 50, 52–53, 56, 61–62, 66, 74, 89, 101, 105, 109.] Dodenhoff informed Byrd and Gist that she hired Delk to strengthen CFR and to make it more productive and that she brought significant experience in the grant arena. [Doc. 47-9 at 39.] The Court concludes Defendant has met its burden under *McDonnell Douglas* to produce evidence from which a jury could conclude Defendant had a legitimate, nondiscriminatory reason for not promoting Plaintiff. Accordingly, the Court will consider whether Plaintiff has met her burden of demonstrating that Defendant's proffered reasons are merely a pretext for discrimination, which would indicate whether Plaintiff could meet her ultimate burden of persuasion and demonstrate discrimination vel non. *See Merritt v. Old Dominion Freight*

*Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) ("The final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination,' which at all times remains with the plaintiff." (alteration in *Merritt* ) (quoting *Burdine*, 450 U.S. at 256)).

To prove an employer's articulated reason is a pretext for discrimination, a plaintiff "must prove 'both that the reason was false, and that discrimination was the real reason' for the challenged conduct." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515). Upon review of the record, the Court determines Plaintiff has failed to demonstrate a genuine issue of material fact as to whether Defendant's proffered reasons for not promoting Plaintiff are merely a pretext for discrimination.

When determining whether an articulated reason is pretextual, "[i]t is the perception of the decision maker which is relevant." *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 445 (4th Cir. 1998), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002). The Fourth Circuit Court of Appeals has addressed the situation where a plaintiff disagrees with the facts underlying a decision maker's assessment of the employee. *Hawkins v. Pepsico, Inc.*, 203 F.3d 274 (4th Cir. 2000). In *Hawkins*, the employer argued it terminated the plaintiff because she performed poorly in her special projects capacity and failed to improve even after receiving negative feedback. *Id.* at 279. The plaintiff claimed the employer's criticisms were inaccurate and insisted she performed her job well. *Id.* The court held the plaintiff could not show the employer's stated reasons for terminating her were not the real reasons for her discharge, noting "'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long

34

as it truly was the reason for plaintiff's termination.'"  *Id.* (citing *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks omitted in *Hawkins*)); *see also DeJarnette*, 133 F.3d at 280 ("But instead of producing evidence that shows [the supervisor's] assessment of her performance was dishonest or not the real reason for her termination—as the law requires—[the plaintiff] disputes the merits of [the] evaluations.").

In her response in opposition to the motion for summary judgment, Plaintiff argues that she "was never disciplined or counseled for [her performance] while employed with [Defendant]."  [Doc. 52 at 29.]  However, that Plaintiff was never disciplined or counseled for her performance fails to establish that Dodenhoff did not believe CFR should be stronger and that Delk was qualified to improve CFR, particularly in this case, where Plaintiff never received a performance review.  Plaintiff has failed to provide any evidence that Dodenhoff's reason was a mask for race discrimination.   "Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext . . . ."  *Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001).  Although Dodenhoff's decision to hire Delk was based on her subjective view of both Plaintiff's performance and Delk's qualifications, "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion."  *Id.* at 1186.  The record in this case, including Musgrove's assessment of Plaintiff and the concerns expressed by others, provides a sufficiently specific factual basis for her decision to hire someone to make CFR stronger.  Moreover, it provides a sufficiently specific factual basis for not promoting Plaintiff within CFR.

Plaintiff also argues that Dodenhoff's selection of Delk without advertising the position raises an inference of race discrimination because Dodenhoff intended to preclude Plaintiff from the position. [Doc. 52 at 24.] The Court is unconvinced. As stated, the record in this case provides a sufficient factual basis for Dodenhoff's opinion that CFR needed to be stronger and that she needed to bring in someone new to make it stronger. Further, Plaintiff also argues that there were personal and/or political ties between Delk and Defendant and that was the reason Delk was hired without advertising the position. [*Id.*] However, hiring someone because of personal or political connections does not evidence the type of discrimination prohibited by Title VII. *See* 42 U.S.C. § 2000e-2(a)(1). It is not this Court's province to decide whether the reason to hire Delk was fair. *See Hawkins*, 203 F.3d at 279 (quoting *DeJarnette*, 133 F.3d at 299). Plaintiff has failed to establish a genuine issue of material fact remains as to whether Defendant's proffered reason for not promoting Plaintiff to Executive Director is a pretext for discrimination. Accordingly, Defendant's motion for summary judgment should be granted with respect to this claim.

Failure to Promote to Senior DOD

Regarding Plaintiff's claim of failure to promote to Senior DOD, again, assuming without deciding Plaintiff can establish a prima facie case of race discrimination, Plaintiff has failed to create a genuine issue of material fact as to whether Defendant's proffered reasons for these actions were a pretext for unlawful discrimination. Defendant argues that, after Plaintiff asked for a promotion and Dodenhoff instructed Plaintiff to provide written justification for the promotion, Plaintiff failed to comply with Dodenhoff's request. [Doc. 47-1 at 34.] Plaintiff testified that she was did not think it was appropriate for

36

Dodenhoff to ask Plaintiff to justify a promotion, so she did not provide anything to Dodenhoff. [Doc. 47-6 at 185:5–16.] Additionally, Plaintiff testified that she never revisited the topic with Dodenhoff [*id.* at 186:9–14] and that she was unaware of whether other employees who were promoted were asked to provide justification for a promotion [*id.* at 183:23–184:2]. The Court concludes Defendant has met its burden under *McDonnell Douglas* to produce evidence from which a jury could conclude Defendant had a legitimate, nondiscriminatory reason for not promoting Plaintiff. Accordingly, the Court will consider whether Plaintiff has met her burden of demonstrating that Defendant's proffered reasons are merely a pretext for discrimination, which would indicate whether Plaintiff could meet her ultimate burden of persuasion and demonstrate discrimination vel non. *See Merritt*, 601 F.3d at 294.

Plaintiff does not specifically address pretext with respect to Defendant's articulated reason for not promoting Plaintiff to Senior DOD.[26] Plaintiff has failed to put forth any evidence to support her assertion that her race was a motivating factor in the decision not to promote Plaintiff to Senior DOD. Accordingly, Defendant's motion for summary judgment should be granted with respect to this claim.

*Denial of Raise*

Defendant argues Plaintiff cannot establish a prima facie case of race discrimination with respect to her denial of raises claim. [Doc. 47-1 at 35–36.] The Court agrees.

In her Amended Complaint, Plaintiff contends she was denied raises because she did not receive performance evaluations. [Doc. 18 ¶¶ 20(c), 27.] However, even assuming

---

[26]Plaintiff addresses pretext only with respect to Defendant's assessment of Plaintiff's performance. [Doc. 52 at 27–29.]

Plaintiff can establish that she suffered an adverse employment action, Plaintiff cannot establish the fourth element of a prima facie case—that white employees did not suffer the adverse employment action under similar circumstances.  The record establishes that Dodenhoff did not conduct annual evaluations for many of her direct reports, including Plaintiff, regardless of race. [Doc. 47-8.] In 2005, Dodenhoff conducted evaluations of two out of five direct reports; in 2006, she conducted evaluations of three out of nine direct reports; in 2007, she conducted evaluations of one out of six direct reports; in 2008, she did not conduct an evaluation of any of her ten direct reports; in 2009, she conducted an evaluation of one of her fourteen direct reports; in 2010, she conducted an evaluation of one of her ten direct reports; and in 2011, she conducted evaluations of two of her twelve direct reports.[27]    [*Id.*]    When Defendant's employees do not receive performance evaluations, they receive a successful by default rating.  [Doc. 48-1 at 145.]  The record establishes that most of Dodenhoff's direct reports, regardless of race, did not receive performance evaluations and, thus, Plaintiff cannot establish that white employees did not suffer the adverse employment action under similar circumstances.  Therefore, Plaintiff has not established a prima facie case of race discrimination based on failure to receive raises as a result of not receiving performance evaluations, and Defendant's motion for summary judgment should be granted with respect to this claim.

*Working Conditions*

---

[27]In 2012, Dodenhoff conducted evaluations of the majority of her direct reports, apparently because Defendant transitioned to a "Universal Review Date" system and required supervisors to provide their employees an evaluation [Doc. 48-1 at 141]; however, all but two of these evaluations occurred after Plaintiff reported to Delk instead of Dodenhoff, and Plaintiff is not listed as a direct report on Dodenhoff's 2012 evaluation table [Doc. 47-8].

Defendant argues Plaintiff cannot establish a prima facie case of race discrimination with respect to her working conditions claim. [Doc. 47-1 at 36–41.] The Court agrees.

In her Amended Complaint, Plaintiff alleges she experienced worse working conditions and a heavier and more difficult schedule than white employees because Plaintiff was not provided private office space, a hiring decision was taken from Plaintiff and given to Delk, Delk took credit for work Plaintiff did, Delk made unreasonable demands of Plaintiff, Delk was inconsistent about conferring directives to Plaintff, and Delk treated Plaintiff in a demeaning manner.[28] [Doc. 18 ¶¶ 20, 22, 27.] However, many of these allegations do not constitute adverse employment actions. *See Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (holding that a supervisor yelling at the plaintiff during a meeting, directing other employees to ignore the plaintiff and spy on her, and refusing to communicate with the plaintiff did not constitute adverse employment actions); *Balinao v. Gonzales*, No. 9:06-cv-0254-PMD-GCK, 2007 WL 5309203, at *14 (D.S.C. May 22, 2007) (holding, among other conduct, that giving an award to another employee for work done by the plaintiff, an executive staff member stating to other staff that he hated the plaintiff and encouraging other staff to be insubordinate with the plaintiff, ignoring the plaintiff in the selection process for new staff, yelling and screaming at the plaintiff, falsely accusing the plaintiff of not communicating with her staff, and picking on the plaintiff during department meetings did not constitute adverse employment actions); *Skipper v. Giant Food, Inc.*, 187 F. Supp. 2d 490, 493 (D. Md. 2002) (holding that

---

[28]To the extent Plaintiff alleges she was subjected to a heavier and more difficult schedule because she was not provided support staff, as previously discussed, such claim is untimely. Additionally, the Court considers only those employment actions that occurred after February 24, 2012.

surveillance of an employee, written warnings, and disclosure of the plaintiff's job performance to other employees did not constitute adverse employment actions). Moreover, Plaintiff again cannot establish the fourth element of a prima facie case—that white employees did not suffer the adverse employment action under similar circumstances. Delk gave Plaintiff the same annual fundraising and personal visit goals as the other director-level employee in CFR and the same personal visit goal as the Assistant DOD. [Doc. 48-2 at 141–48-3 at 27.] Additionally, Plaintiff told Byrd and Gist that all CFR employees felt these goals set them up to fail. [Doc. 47-22 at 24:22–25:4.] Plaintiff has failed to allege that she was treated differently *because* she is black or that any white employees were treated better than Plaintiff. Therefore, Plaintiff has not established a prima facie case of race discrimination based on working conditions, and Defendant's motion for summary judgment should be granted with respect to this claim.

### Hostile Work Environment Claim

To prove a hostile work environment, the plaintiff must show that: (1) he was harassed because of his race; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) some basis exists for imputing liability to the employer. *Gilliam v. South Carolina Department of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment, stating that a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person

would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21. Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). "[C]omplaints premised on nothing more than rude treatment by co-workers, callous behavior by supervisors, or a routine difference of opinion and personality conflict with one's supervisors are not actionable under Title VII." *Id.*

When considering a plaintiff's claim that he was subjected to a hostile work environment, the Court must consider the totality of the circumstances. Relevant factors "may include the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "To be actionable, the conduct must create an objectively hostile or abusive work environment, and the victim must also perceive the environment to be abusive." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2007).

Plaintiff has not shown that her alleged harassment was based on her race. There is no direct evidence that any of the conduct was motivated by racial animus. Plaintiff points to no evidence that derogatory comments were made to her or anyone about her race. Moreover, Plaintiff has failed to establish that the conduct was sufficiently severe or

pervasive to be actionable.  Accordingly, Defendant's motion for summary judgment should be granted as to Plaintiff's hostile work environment claim.

## **RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that Defendant's motion for summary judgment be GRANTED.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

June 9, 2015
Greenville, South Carolina